**SHEEHAN & ASSOCIATES, P.C.**
Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, NY 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*

United States District Court
Eastern District of New York

1:19-cv-07228

| | |
|---|---|
| Candice Rosado, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| - against - | Complaint |
| Riverside Partners L.L.C. and Nustef Baking Ltd., | |
| Defendants | |

Plaintiff by attorneys alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.     Riverside Partners L.L.C. ("defendant Riverside") and Nustef Baking Ltd. ("defendant Nustef") (collectively, "defendants") manufacture, distribute, market, label and sell french vanilla traditional Italian waffle cookies known as pizzelles purporting to be flavored with vanilla, under their Reko brand ("Products").

2.     The Products are available to consumers from retail and online stores of third-parties and are sold in containers of 5.25 OZ (50g) and 20 OZ (565g).

3.     The Product's relevant front label representations include "Vanilla" and "The Authentic Italian Waffle Cookie."



4.    The back panel includes the Nutrition Facts, ingredient list and a description of the Products.



**Addictively Delicious!**

> Created from my family's centuries-old recipe from the Abruzzo region of Italy, our pizzelle cookies are treasured for their crispy, delicate flavor and time-honored artistry. Made with cast iron griddles and the best of ingredients, I bring you a little taste of my heritage!

5.    The Product's front label and advertising makes direct representations with respect to their primary recognizable and characterizing flavor by the word "Vanilla" gives consumers the impression they contain real vanilla and are flavored exclusively by real vanilla when this is not correct.[1]

I.    Vanilla is Constantly Subject to Efforts at Imitation Due to High Demand

6.    The tropical orchid of the genus Vanilla (*V. planifolia*) is the source of the prized flavor commonly known as vanilla, defined by law as "the total sapid and odorous principles extractable from one-unit weight of vanilla beans."[2]

7.    Vanilla's "desirable flavor attributes…make it one of the most common ingredients used in the global marketplace, whether as a primary flavor, as a component of another flavor, or for its desirable aroma qualities."[3]

8.    Though the Pure Food and Drugs Act of 1906 ("Pure Food Act") was enacted to "protect consumer health and prevent commercial fraud," this was but one episode in the perpetual struggle against those who have sought profit through sale of imitation and lower quality commodities, dressed up as the genuine articles.[4]

9.    It was evident that protecting consumers from fraudulent vanilla would be

---

[1] 21 C.F.R. § 101.22(i).
[2] 21 C.F.R. §169.3(c).
[3] Daphna Havkin-Frenkel, F.C. Bellanger, Eds., Handbook of Vanilla Science and Technology, Wiley, 2018.
[4] Berenstein, 412; some of the earliest recorded examples of food fraud include unscrupulous Roman merchants who sweetened wine with lead.

challenging, as E. M. Chace, Assistant Chief of the Foods Division of the U.S. Department of Agriculture's Bureau of Chemistry, noted "There is at least three times as much vanilla consumed [in the United States] as all other flavors together."[5]

10.    This demand could not be met by the natural sources of vanilla, leading manufacturers to devise clever, deceptive and dangerous methods to imitate vanilla's flavor and appearance.

11.    Today, headlines tell a story of a resurgent global threat of "food fraud" – from olive oil made from cottonseeds to the horsemeat scandal in the European Union.[6]

12.    Though "food fraud" has no agreed-upon definition, its typologies encompass an ever-expanding, often overlapping range of techniques with one common goal: giving consumers less than what they bargained for.

### A.   Food Fraud as Applied to Vanilla

13.    Vanilla is considered a "high-risk [for food fraud] product because of the multiple market impact factors such as natural disasters in the source regions, unstable production, wide variability of quality and value of vanilla flavorings," second only to saffron in price.[7]

14.    The efforts at imitating vanilla offers a lens to the types of food fraud regularly employed across the spectrum of valuable commodities in today's interconnected world.[8]

---

[5] E. M. Chace, "The Manufacture of Flavoring Extracts," Yearbook of the United States Department of Agriculture 1908 (Washington, DC: Government Printing Office, 1909) pp.333–42, 333 quoted in Nadia Berenstein, "Making a global sensation: Vanilla flavor, synthetic chemistry, and the meanings of purity," History of Science 54.4 (2016): 399-424 at 399.

[6] Jenny Eagle, 'Today's complex, fragmented, global food supply chains have led to an increase in food fraud', FoodNavigator.com, Feb. 20, 2019; M. Dourado et al., Do we really know what's in our plate?. Annals of Medicine, 51(sup1), 179-179 (May 2019); Aline Wisniewski et al., "How to tackle food fraud in official food control authorities in Germany." Journal of Consumer Protection and Food Safety: 1-10. June 11, 2019.

[7] Société Générale de Surveillance SA, ("SGS "), Authenticity Testing of Vanilla Flavors – Alignment Between Source Material, Claims and Regulation, May 2019.

[8] Kathleen Wybourn, DNV GL, Understanding Food Fraud and Mitigation Strategies, PowerPoint Presentation, Mar. 16, 2016.

| Type of Food Fraud | Application to Vanilla |
|---|---|
| ➢ Addition of markers specifically tested for instead of natural component of vanilla beans | • Manipulation of the carbon isotope ratios to produce synthetic vanillin with similar carbon isotope composition to natural vanilla |
| ➢ Appearance of *more* and/or higher quality of the valued ingredient | • Ground vanilla beans and/or seeds to provide visual appeal as "specks" so consumer thinks the product contains real vanilla beans, when the ground beans have been exhausted of flavor<br>• Caramel to darken the color of an imitation vanilla so it more closely resembles the hue of real vanilla[9]<br>• Annatto and turmeric extracts in dairy products purporting to be flavored with vanilla, which causes the color to better resemble the hue of rich, yellow butter |
| ➢ Substitution and replacement of a high quality ingredient with alternate ingredient of lower quality | • Tonka beans, though similar in appearance to vanilla beans, are banned from entry to the United States due to fraudulent use<br>• Coumarin, a toxic phytochemical found in Tonka beans, added to imitation vanillas to increase vanilla flavor perception |
| ➢ Addition of less expensive substitute ingredient to mimic flavor of more valuable component | • Synthetically produced ethyl vanillin, derived from recycled paper, tree bark or coal tar, to imitate taste of real vanilla |
| ➢ Compounding, Diluting, Extending | • "to mix flavor materials together at a special ratio in which they [sic] compliment each other to give the desirable |

---

[9] Renée Johnson, "Food fraud and economically motivated adulteration of food and food ingredients." Congressional Research Service R43358, January 10, 2014.

aroma and taste"[10]

- Combination with flavoring substances such as propenyl guaethol ("Vanitrope"), a "flavoring agent [, also] unconnected to vanilla beans or vanillin, but unmistakably producing the sensation of vanilla"[11]

- "Spiking" or "fortification" of vanilla through addition of natural and artificial flavors including vanillin, which simulates vanilla taste but obtained from tree bark

➢ Addition of fillers to give the impression there is more of the product than there actually is

- Injection of vanilla beans with mercury, a poisonous substance, to raise the weight of vanilla beans, alleged in *International Flavors and Fragrances (IFF), Inc. v. Day Pitney LLP and Robert G. Rose,* 2005, Docket Number L-4486-09, Superior Court of New Jersey, Middlesex County.

- Subtle, yet deliberate misidentification and obfuscation of a product's components and qualities as they appear on the ingredient list

  o "ground vanilla beans" gives impression it describes unexhausted vanilla beans when actually it is devoid of flavor and used for aesthetics

➢ Ingredient List Deception[12]

  o "natural vanilla flavorings" – "-ing" as suffix referring to something *like* that which is described

  o "Vanilla With Other Natural Flavors" – implying – wrongly – such a product has a sufficient amount of vanilla to characterize the food; often containing high amount of vanillin, which must be disclosed as an

---

[10] Chee-Teck Tan, "Physical Chemistry in Flavor Products Preparation: An Overview" in Flavor Technology, ACS Symposium Series, Vol. 610 1995. 1-17.

[11] Berenstein, 423.

[12] Recent example of this would be "evaporated cane juice" as a more healthful sounding term to consumers to identify sugar.

*artificial* flavor when paired with vanilla

B. <u>The Use of Vanillin to Simulate Vanilla</u>

15.     The most persistent challenger to the authenticity of real vanilla has been synthetic versions of its main flavor component, vanillin.

16.     First synthesized from non-vanilla sources by German chemists in the mid-1800s, vanillin was the equivalent of steroids for vanilla flavor.

17.     According to Skip Rosskam, a professor of vanilla at Penn State University and former head of the David Michael flavor house in Philadelphia, "one ounce of vanillin is equal to a full gallon of single-fold vanilla extract."[13]

18.     Today, only 1-2% of vanillin in commercial use is vanillin obtained from the vanilla plant, which means that almost all vanillin has no connection to the vanilla bean.

19.     Nevertheless, disclosure of this powerful ingredient has always been required where a product purports to be flavored with vanilla. *See* <u>Kansas State Board of Health, Bulletin, Vol. 7</u>, 1911, p. 168 (cautioning consumers that flavor combinations such as "vanilla and vanillin…vanilla flavor compound," etc., are not "vanilla [extract] no matter what claims, explanations or formulas are given on the label.").

20.     Since vanilla is the only flavor with its own standard of identity, its labeling is controlled not by the general flavor regulations but by the standards for vanilla ingredients.

21.     This means that if a product is represented as being characterized by vanilla yet also contains non-vanilla vanillin, the label and packaging must declare the presence of vanillin and identify it as an artificial flavor. *See* Vanilla-vanillin extract at 21 C.F.R. § 169.180(b) ("The

---

[13] Katy Severson, <u>Imitation vs. Real Vanilla: Scientists Explain How Baking Affects Flavor</u>, Huffington Post, May 21, 2019.

specified name of the food is "Vanilla-vanillin extract _-fold" or "_-fold vanilla-vanillin extract", followed immediately by the statement "contains vanillin, an artificial flavor (or flavoring)".); *see also* 21 C.F.R. § 169.181(b), § 169.182(b) (similar declarations required for Vanilla-vanillin flavoring and Vanilla-vanillin powder).

22.    This prevents consumers from being misled by products which may taste similar to real vanilla and but for consumer protection requirements, would be sold at the price of real vanilla.

C.    "Natural Vanillins" are Produced in a Non-Natural Manner

23.    The past ten years have seen the introduction of vanillin ingredients that purport to be a "natural flavor," based on the raw material being a natural source and undergoing a natural production process.

24.    While vanillin can be made in an allegedly "natural" fermentation process from ferulic acid, the cost is prohibitive for use in most applications.

25.    When eugenol, from cloves are used to produce vanillin, it is subject to chemical reactions and processes considered to be synthetic by the FDA.

26.    These low-cost "natural vanillins" are produced by the ton in China, with little transparency or verification, before being delivered to the flavor companies for blending.

D.    Vanilla "WONF" to Imitate Real Vanilla

27.    The global shortage of vanilla beans has forced the flavor industry to "innovate[ing] natural vanilla solutions…to protect our existing customers."[14]

28.    The "flavor industry" generally refers to the largest "flavor houses" such as Symrise AG, Firmenich, Givaudan, International Flavors and Fragrances, Frutarom and Takasago

---

[14] Amanda Del Buono, Ingredient Spotlight, Beverage Industry, Oct. 3, 2016.

International along with the largest food manufacturing companies such as Unilever.

29.   Their "customers" do not include the impoverished vanilla farmers who are at the mercy of these global conglomerates nor consumers, who are sold products labeled as "vanilla" for the same or higher prices than when those products contained *only* vanilla.

30.   On the surface, the flavor industry has developed schemes such as "Sustainable Vanilla Initiative" and "Rainforest Alliance Certified," its actual interests are opposed to price stability in the vanilla markets.

31.   These companies benefit from high vanilla prices and use of less real vanilla because it necessitates greater use of higher margin, proprietary, "vanilla-like" flavorings made with advanced technology and synthetic biology.

32.   In fact, high profile programs such as the "Sustainable Vanilla Initiative" and "Rainforest Alliance Certified" have been silently questioned among the vanilla farmers of Madagascar.

33.   Reports have circulated that contrary to promoting "sustainability" of vanilla, these programs push the needle in the opposite direction through cash payments to farmers to destroy their vanilla crops.

34.   Under the guise of promoting crop diversification, vanilla farmers are being urged to produce the ubiquitous palm oil instead of vanilla.

35.   Other tactics alleged to be utilized by companies such as Syrmise and Givaudan include "phantom bidding," where saboteurs claim they will pay a higher price to small producers, only to leave the farmers in the lurch, forced to sell at bottom dollar to any remaining bidders.[15]

36.   These conclusions, while not admitted, are consistent with the comments of industry

---

[15] Monte Reel, The Volatile Economics of Natural Vanilla in Madagascar, Bloomberg.com, Dec. 16, 2019.

executives.

37.    According to Suzanne Johnson, vice president or research at a North Carolina laboratory, "Many companies are trying to switch to natural vanilla with other natural flavors [WONF] in order to keep a high-quality taste at a lower price."

38.    The head of "taste solutions" at Irish conglomerate Kerry, urged flavor manufacturers must "[G]et creative" and "build a compounded vanilla flavor with other natural flavors."

39.    These compounded flavors typically exist in a "black box" and "consist of as many as 100 or more flavor ingredients," blended together in a special ratio to complement and enhance the vanilla component.[16]

40.    A compounded vanilla flavor "that matches the taste of pure vanilla natural extracts" can supposedly "provide the same vanilla taste expectation while requiring a smaller quantity of vanilla beans. The result is a greater consistency in pricing, availability and quality."[17]

41.    That high level executives in the flavor industry are willing to openly boast of their stratagems to give consumers less vanilla for the same price is not unexpected.

42.    This is due in part to the once powerful and respected trade group for the flavor industry, The Flavor and Extract Manufacturers Association ("FEMA"), abandoning its "self-policing" of misleading vanilla labeling claims and disbanding its Vanilla Committee.

43.    Though FEMA previously opposed efforts of industry to deceive consumers, it cast the general public to the curb in pursuit of membership dues from its largest members.

---

[16] Hallagan and Drake, FEMA GRAS and U.S. Regulatory Authority: U.S. Flavor and Food Labeling Implications, Perfumer & Flavorist, Oct. 25, 2018; Charles Zapsalis et al., *Food chemistry and nutritional biochemistry*. Wiley, 1985, p. 611 (describing the flavor industry's goal to develop vanilla compound flavors "That *Seem*[s] to be Authentic or at Least Derived from a Natural Source") (emphasis added).
[17] Donna Berry, Understanding the limitations of natural flavors, BakingBusiness.com, Jan. 16, 2018.

II.  The Products are Misleading Because they Contain Artificial Vanilla Flavor

44.    A  pizzelle  labeled  with  the  unqualified  term  "vanilla"  gives  consumers  the impression (1) vanilla is the characterizing flavor, (2) vanilla is contained in a sufficient amount to flavor the product, (3) the flavor is derived from vanilla extract or vanilla flavoring, (4) no other flavors simulate, resemble, reinforce, or enhance flavoring from vanilla or permit less real vanilla to be used and (5) vanilla is the exclusive source of flavor.

A.  Ingredient List Declaration of "Artificial Vanilla Flavor" Reveals Flavor is Not Exclusively Vanilla

45.    The Products are misleading because despite the front label and advertising, they fail to contain real vanilla in the amount, quantity and/or type which the label suggests, based on the ingredient list identifying "Artificial Vanilla Flavor."

**INGREDIENTS:** FLOUR, SUGAR, LIQUID WHOLE EGG, CANOLA OIL, ARTIFICIAL VANILLA FLAVOR, SOY LECITHIN, CARAMEL COLOR, BAKING POWDER, SALT.

**INGREDIENTS:** FLOUR, SUGAR, LIQUID WHOLE EGG, CANOLA  OIL,  ARTIFICIAL VANILLA FLAVOR,  SOY LECITHIN, CARAMEL COLOR, BAKING POWDER, SALT.

46.    Where a product makes representations as to its characterizing flavor, the type, composition and amount of the flavor(s) is required to be designated in a truthful and non-misleading way, based on various factors.  *See* 21 C.F.R. § 101.22(i).

Flavor Conditions                                      Flavor Labeling Requirements

| | |
|---|---|
| No artificial flavor which simulates, resembles or reinforces the characterizing flavor | "vanilla"<br><br>21 C.F.R. § 101.22(i)(1) |
| If the food is (1) expected to contain characterizing food ingredient e.g., strawberries in "strawberry shortcake" and (2) contains natural flavor derived from such ingredient and (3) an amount of characterizing ingredient insufficient to independently characterize the food<br><br>If the food is (1) expected to contain characterizing food ingredient e.g., strawberries in "strawberry shortcake" and (2) contains natural flavor derived from such ingredient and (3) the food contains no such ingredient | the name of the characterizing flavor may be immediately preceded by the word "natural" and shall be immediately followed by the word "flavored," e.g., "natural strawberry flavored shortcake," or "strawberry flavored shortcake"<br><br>21 C.F.R. § 101.22(i)(1)(i) |
| If none of the natural flavor in the food is derived from the product whose flavor is simulated | "artificially flavored"<br><br>21 C.F.R. § 101.22(i)(1)(ii) |
| If the food contains a characterizing flavor from the product whose flavor is simulated and other natural flavor which simulates, resembles or reinforces the characterizing flavor | "natural strawberry flavored shortcake with other natural flavors" or "strawberry shortcake with other natural flavors"<br><br>21 C.F.R. § 101.22(i)(1)(iii); 21 C.F.R. § 101.22(i)(1); 21 C.F.R. § 101.22(i)(1)(i) |
| If the food contains any artificial flavor which simulates, resembles or reinforces the characterizing flavor | "artificially flavored strawberry" or "grape artificially flavored"<br><br>21 C.F.R. § 101.22(i)(2) |

47.    "Natural flavor" refers to "the essential oil, oleoresin, essence or extractive…which contains the flavoring constituents" from a natural source such as plant material and can refer to combinations of natural flavors. *See* 21 C.F.R. § 101.22(a)(3).

48.    "Artificial flavor" in contrast is any substance whose function is to impart flavor that is not derived from a natural source.  *See* 21 C.F.R. § 101.22(a)(1).

12

49.    The front label "Vanilla" gives the impression that all of the flavor (taste sensation and ingredient imparting same) in the Product is contributed from vanilla beans. *See* 21 C.F.R. § 169.3(c) ("The term *unit of vanilla constituent* means the total sapid and odorous principles extractable from one unit weight of vanilla beans").

50.    This impression is contradicted by the ingredient list which contains "Artificial Vanilla Flavor."

51.    "Artificial Vanilla Flavor" does not contain flavor from vanilla beans and refers to various synthetic vanillin ingredients, including ethyl vanillin, which is derived from wood pulp and coal tar.

52.    "Artificial vanilla flavor" is not indicated anywhere on the Product's front label.

53.    Had the Products flavoring derived exclusively from vanilla, the ingredient list would declare the common or usual names of one or more of the exclusively vanilla ingredients, *viz*, Vanilla Extract, Concentrated Vanilla Extract, Vanilla Flavoring and Concentrated Vanilla Flavoring, and not declare any other flavor ingredient.  *See* 21 C.F.R. §§ 169.175 to 169.178.

54.    These exclusively vanilla ingredients – vanilla extract, vanilla flavoring, etc. – differ only in that the former is at least thirty-five (35) percent ethyl alcohol while the latter is less than this amount.[18]

III.    Coloring Misleads Consumers to Expect Products Contain More Vanilla Than They Do

55.    The Product contains caramel color, indicated on the ingredient list.

56.    The use of caramel color darkens the Products to a color closer to that of vanilla beans and vanilla extract.

57.    The darker color makes the consumer (1) less likely to question or be skeptical of the

---

[18] 21 C.F.R. §§ 169.175 (Vanilla extract.), 169.177 (Vanilla flavoring.); also concentrated versions of each of these.

amount and type of vanilla in the Products and (2) expect the Products contain more vanilla than they actually do.

IV. Conclusion

58.    The proportion of the characterizing flavor component, vanilla, has a material bearing on price or consumer acceptance of the Products because they are more expensive and desired by consumers.

59.    The Products are misleading because they do not contain the amount, type and percentage of vanilla as a component of the flavoring which is required by law and consistent with consumer expectations.

60.    Had plaintiff and class members known the truth, they would not have bought the Product or would have paid less for it.

61.    The Product contains other representations which are misleading and deceptive.

62.    As a result of the false and misleading labeling, the Product is sold at a premium price, approximately no less than $4.99 per 20 OZ, excluding tax – compared to other similar products represented in a non-misleading way.

<u>Jurisdiction and Venue</u>

63.    Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

64.    Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

65.    Upon information and belief, the aggregate amount in controversy is more than

$5,000,000.00, exclusive of interests and costs.

66.    This is a reasonable assumption because defendant's Products are sold in thousands of stores across all 50 states and have been sold bearing the allegedly misleading claims for at least six years.

67.    Plaintiff Candice Rosado is a citizen of New York.

68.    Defendant Riverside Partners L.L.C. is a Delaware limited liability company with a principal place of business in New York, New York County, New York and upon information and belief, at least one member of defendant is not a citizen of New York.

69.    Defendant Nustef Baking Ltd. is a Canadian limited company with a principal place of business in Mississauga, Ontario.

70.    Diversity jurisdiction exists because defendant Riverside takes the citizenship of its members such that plaintiff and defendant are citizens of different states and defendant Nustef, a citizen or subject of a foreign state, Canada, is an additional party.  28 U.S.C. § 1332(a)(3).

71.    Diversity exists because even if plaintiff and defendant Riverside are both citizens of this state, plaintiff seeks to represent persons in all 50 states who purchased the Products. *Gonzales v. Agway Energy Services, LLC*, No. 18-cv-235 (N.D.N.Y. Oct. 22, 2018) ("At this time, the allegation that some class member maintains diversity with Defendant is sufficient to establish minimal diversity under CAFA" and citing 28 U.S.C. § 1332(d)(1)(D) "'the term 'class members' means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.").

72.    Diversity exists because plaintiff is a citizen of a state, New York, and defendant Nustef is a citizen or subject of a foreign state, Canada. 28 U.S.C. § 1332(d)(2)(C) (a district court has "original jurisdiction of any civil action in which the matter in controversy exceeds the sum or

value of $5,000,000, exclusive of interest and costs, and is a class action in which…any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.").

73.    This court has personal jurisdiction over defendants because it conducts and transacts business, contracts to provide and/or supply and provides and/or supplies services and/or goods within New York.

74.    Venue is proper because plaintiff and many class members reside in this District and defendants do business in this District and State.

75.    A substantial part of events and omissions giving rise to the claims occurred in this District.

<u>Parties</u>

76.    Plaintiff Candice Rosado is a citizen of Richmond County, New York.

77.    Defendant Riverside is a Delaware limited liability company with a principal place of business in New York (city), New York (state), New York County and is a citizen of the States of its members.

78.    One of defendant's members is a citizen of Ohio.

79.    The other members of defendant are not publicly known at this time.

80.    Defendant Nustef Baking Ltd. is a Canadian limited company with a principal place of business in Mississauga, Ontario.

<u>Class Allegations</u>

81.    The classes will consist of all consumers in New York, the other 49 states and a nationwide class where applicable.

82.    Common questions of law or fact predominate and include whether defendant's

16

representations and practices were likely to harm plaintiff and if plaintiffs and class members are entitled to damages.

83.     Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive actions.

84.     Plaintiff is an adequate representative because his or her interests do not conflict with other members.

85.     No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

86.     Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

87.     Plaintiff's counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

88.     Plaintiff seek class-wide injunctive relief because the practices continue.

<u>New York GBL §§ 349 & 350</u>
<u>(Consumer Protection from Deceptive Acts)</u>

89.     Plaintiffs incorporate by reference all preceding paragraphs.

90.     Plaintiff and class members desired to purchase products which were as described by defendant and expected by reasonable consumers, given the product type.

91.     Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

92.     Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it gives the impression to consumers the Products contain sufficient amounts of the highlighted ingredient, vanilla, to flavor the Products and did not contain non-vanilla flavors when it contained no flavor from real vanilla.

93.   Plaintiff and class members relied on the representations and paid more for the Products as a result of what defendant stated about the Products.

94.   Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

95.   Plaintiff incorporates by reference all preceding paragraphs.

96.   Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Products through misrepresenting the amount, quantity and/or proportion of the flavoring ingredient.

97.   Defendant had a duty to disclose and/or provide non-deceptive labeling of the Product and its components and ingredients, and knew or should have known same were false or misleading.

98.   This duty is based on defendant's position as an entity which has held itself out as having special knowledge and experience in the production, service and/or sale of the product or service type.

99.   The representations took advantage of consumers' (1) cognitive shortcuts made at the point-of-sale and (2) trust placed in defendant, a well-known and respected brand in this sector.

100.  Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

101.  Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Breaches of Express Warranty, Implied Warranty of Merchantability and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*</u>

102.  Plaintiff incorporates by reference all preceding paragraphs.

103.  Defendant manufactures and sells products which purport to contain sufficient amounts of the highlighted ingredients, vanilla, to characterize the taste or flavor of the Products, which is desired by consumers.

104.  The Products warranted to Plaintiff and class members that they possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and other attributes which they did not due to the presence or absence of the aforementioned ingredient.

105.  Defendant had a duty to disclose and/or provide a non-deceptive description and identification of the Product and its ingredients.

106.  This duty is based, in part, on defendant's position as one of the most recognized companies in the world manufacturing and selling the pizzelle products.

107.  Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

108.  The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable.

109.  Plaintiff and class members relied on defendant's claims, paying more than they would have.

Fraud

110.  Plaintiff incorporates by references all preceding paragraphs.

111.  Defendant's purpose was to sell a product which purported to contain valuable and desired characterizing ingredients and/or flavors, and represent the Products were exclusively flavored by the designated ingredients and contained sufficient independent amounts of same.

112.  Defendant's fraudulent intent is evinced by its failure to accurately indicate the

Products contained less of the desired ingredients or none at all.

113.   Plaintiff and class members observed and relied on defendant's claims, causing them to pay more than they would have, entitling them to damages.

<u>Unjust Enrichment</u>

114.   Plaintiff incorporates by reference all preceding paragraphs.

115.   Defendant obtained benefits and monies because the Product were not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, restitution and disgorgement for members of the State Subclasses pursuant to the applicable laws of their States;

4. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   December 26, 2019

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan

Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, NY 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*
E.D.N.Y. # SS-8533
S.D.N.Y. # SS-2056

*-and-*

Law Offices of Peter N. Wasylyk
Peter N. Wasylyk (*PHV to file*)
1307 Chalkstone Ave.
Providence, RI 02908
Telephone: (401) 831-7730
Facsimile: (401) 861-6064
*pnwlaw@aol.com*

1:19-cv-07228
United States District Court
Eastern District of New York

Candice Rosado, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

Riverside Partners L.L.C. and Nustef Baking Ltd.,

Defendants

# Complaint

```
Sheehan & Associates, P.C.
 505 Northern Blvd., #311
   Great Neck, NY 11021
   Tel: (516) 303-0552
   Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  December 26, 2019

/s/ Spencer Sheehan
Spencer Sheehan